OPINION
Plaintiffs-appellants, Wendolyn Krauss and her husband, Jack Krauss,[1] appeal an order of the Butler County Court of Common Pleas denying their motion for a new trial on damages.
On August 4, 1993, appellant and defendant-appellee, Kevin Kilgore, were involved in an automobile collision at the intersection of Cox Road and Tylersville Road. At the time of the collision, appellant was taking her son to summer camp. At trial, appellant testified that her vehicle struck appellee's vehicle broadside when appellee ran a red light when appellant was already in the intersection. Appellee conceded his negligence at trial.
Appellant testified that just before the impact, she "locked" her left arm on the steering wheel while at the same time she "reached across and turned real hard to [her] right" to brace her son in the front passenger's seat. After the investigation of the accident was completed, all parties drove away in their respective vehicles. Appellant testified that while continuing en route to her son's camp, she began losing sensation in two of her left fingers and her neck started to tighten. Later that day, she called her family physician, Edward P. Drohan, M.D., who recommended that she put ice on her neck and left shoulder and take Ibuprofen.
On August 9, 1993, appellant saw Dr. Drohan's assistant because she was experiencing numbness and tingling in her left arm and two of her left fingers as well as pain in her neck and left shoulder. After examination, Dr. Drohan's assistant noted that appellant suffered from a muscular strain secondary to the accident. Appellant saw Dr. Drohan on September 9 and 30, 1993 and both times complained of neck pain. Appellant also complained of pain down her left arm during the September 30 visit.
Dr. Drohan prescribed some pain medication, ordered a computerized axial tomography ("CAT") scan of appellant's cervical spine, and prescribed physical therapy for three weeks. Appellant eventually stopped the physical therapy because "it wasn't doing any good." The CAT scan, performed on October 4, 1993, was "normal from C-4 through C-7" (that is, from the fourth through the seventh cervical vertebra), but the spinal x-ray performed in concert with the CAT scan "revealed mild degenerative changes at C-5 and C-6." Appellant saw Dr. Drohan again in November and December, 1993. She continued to complain about neck pain and at times, arm pain. Appellant also complained about headaches.
On October 18, 1993, appellant went to see M. Dolores Graf, D.C., a chiropractor. Following an examination and x-rays of appellant's neck and mid-back, Dr. Graf diagnosed, inter alia, postural and rotational malpositions, "discogenic spondylosis[2] at C5 and C6," and uncovertebral arthrosis. Appellant's chiropractic treatment lasted from October 20, 1993 to February 23, 1994. During her treatment, appellant intermittently complained of headaches, neck pain, and achiness or pain in her left shoulder.
After a follow-up visit on January 31, 1994 for neck pain, Dr. Drohan referred appellant to Thomas G. Saul, M.D., a neurosurgeon. Dr. Drohan testified that in light of appellant's consistent complaints of neck pain despite the therapeutic treatments, medications, and the passage of time, surgical referral was necessary. Appellant was first examined by Dr. Saul on February 7, 1994. Dr. Saul found a slight weakness of the tricep on the left side in appellant's left arm but ascribed no significance to that finding at that particular time. Nevertheless, Dr. Saul ordered a magnetic resonance imaging ("MRI") scan.
The MRI scan, which was performed on February 11, 1994, showed a spondylosis of appellant's cervical spine. Dr. Saul explained that appellant had "arthritic spur formations, [that is] bony overgrowths, at the back of the cervical spine in the areas of the nerve root, and she had those present at the disk space between the fifth and sixth cervical vertebra, and the spurring was greater on the left than on the right[.]" Dr. Saul testified that the MRI "showed a definite C5-6 large osteophyte[3] on the left consistent with [appellant's] signs and symptoms." Because appellant's symptoms in her left arm were getting worse, Dr. Saul subsequently recommended an anterior cervical diskectomy and drilling of the left-sided C5-6 osteophyte. The goal of the surgery, which was performed on July 11, 1994, was to relieve the compression by the bony spur on the nerve root by removing the bony spur. Following surgery, Dr. Saul saw appellant four times. Dr. Saul told appellant that she would be intermittently susceptible to neck pain and possibly occasional left arm pain but that such pain should respond to anti-inflammatory medication and that it should not debilitate or disable her. At trial, both Dr. Saul and appellant expressed great satisfaction with the results of the surgery.
On June 13, 1995, appellants filed a complaint against appellee seeking damages for appellant's medical expenses, lost wages, pain and suffering, loss of enjoyment of life, and for Jack Krauss' loss of consortium incurred as a result of the accident. On November 26, 1996, the jury rendered a verdict of $10,500 in favor of appellant. However, the jury returned a verdict for Jack Krauss in the amount of $0. The jury verdicts, which were finalized by judgment entry on December 18, 1996, were not tested by interrogatories. On January 3, 1997, appellants filed a motion for a new trial on damages which was overruled by the trial court on April 7, 1997.
Appellants timely filed this appeal and raise the following two assignments of error:
Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS/APPELLANTS IN AWARDING PLAINTIFF WENDOLYN KRAUSS DAMAGES IN AN AMOUNT WHICH WAS NOT SUPPORTED BY SUBSTANTIAL, COMPETENT, AND CREDIBLE EVIDENCE.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS/APPELLANTS IN AWARDING NO DAMAGES ON PLAINTIFF JACK KRAUSS'S LOSS OF CONSORTIUM CLAIM, WHEN DAMAGES ON SAID CLAIM WERE ESTABLISHED BY UNCONTROVERTED EVIDENCE[.]
In both assignments of error, appellants argue that the jury's award warrants granting a new trial. Appellants argue that the jury's award was against the manifest weight of the evidence because it was less than the undisputed medical bills and lost wages and gave nothing for pain and suffering and loss of consortium.
Civ.R. 59(A)(6) provides that a new trial may be granted when "the judgment is not sustained by the weight of the evidence." Because a trial court has broad discretion in determining whether a jury verdict is against the manifest weight of the evidence, Osler v. Lorain (1986), 28 Ohio St.3d 345, 351, a trial court's ruling on a motion for a new trial based upon the weight of the evidence will not be reversed absent an abuse of discretion. Antal v. Olde Worlde Prod., Inc. (1984), 9 Ohio St.3d 144, 145. Moreover, when a jury's award is supported by some competent, credible evidence going to the essential elements of the case, that award will not be reversed by a reviewing court as being against the manifest weight of the evidence. C. E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, 280. In the area of damages in a personal injury case, neither a reviewing court nor a trial court can substitute its judgment for that of the jury. Litchfield v. Morris (1985), 25 Ohio App.3d 42, 44.
We first turn to the jury's award of $10,500 in favor of appellant. Appellant testified that before the accident, she never had problems associated with or medical treatment for pain in her neck or in her upper extremities. Appellant testified that following the accident, she was able to continue working part time (twenty hours per week). She further testified that she went full time in January 1994 but went back to part time (thirty hours per week) in May 1994. Appellant explained that she requested to be returned to part time because, with her neck and left shoulder and arm hurting, it was bothering her too much to sit at a desk all day. Appellant stated that following the accident, she had "a hard time doing housework, cooking, and things around the house" and that as a result, she depended heavily on her husband and children to help out. Appellant stated, however, that since the surgery, she has been able to take up all the responsibilities she had around the house before the accident with the exception of lifting and carrying groceries and baskets of laundry. With regard to the surgery, appellant testified that she felt relief in her arm immediately afterward and that she no longer has numbness or headaches. Appellant still experiences intermittent pain in her neck and shoulder, as predicted by Dr. Saul.
Dr. Graf testified that it was her opinion that the neck pain, left arm tingling, and headaches experienced by appellant while under chiropractic treatment were "a direct result from the injury [appellant] sustained in August of `93." On cross-examination, Dr. Graf testified that she was aware of the existence of bone spurs on appellant's MRI. Dr. Graf testified that these bone spurs were consistent with the x-rays (ordered by Dr. Graf) which showed spondylosis and arthrosis.
Dr. Drohan testified that he referred appellant to Dr. Saul because he (Dr. Drohan) was trying to find a cause to appellant's condition, which had not improved despite the therapeutic treatments, medication, and the passage of time. Dr. Drohan testified he expects soft tissue injuries caused by a trauma to improve with time, and such was not the case with appellant. Dr. Drohan opined that the accident caused appellant's neck and left arm pain. Dr. Drohan testified that the degenerative changes, revealed by the x-ray performed in concert with the CAT scan, would have been in existence before the accident. Dr. Drohan also testified that he never took appellant off work or restricted her activities.
Dr. Saul testified it was his opinion that the surgery was directly and causally related to the accident. It was also his opinion that the symptoms he treated appellant for were a direct result of the accident "which resulted in an exacerbation or precipitation of symptoms due to an underlying condition called cervical spondylosis." Dr. Saul testified that the MRI showed an osteophyte (or bony spur) "on both sides at C5-6," with a spurring greater on the left than on the right. Dr. Saul stated that the existence of the osteophyte was very consistent with appellant's left arm symptoms. Dr. Saul opined that appellant's long-standing left arm pain was due to the significant spur on the left at the fifth and sixth cervical vertebra.
Dr. Saul testified it was also his opinion that the osteophyte was probably present at the time of the accident because "these things develop over time." In his operative report, Dr. Saul noted that the "left uncinate * * * was characterized by osteophyte which was the surgical target and the cause of the patients clinical problems." Dr. Saul explained that the term "clinical problems" referred to "the constellation of symptoms that occurred on the left side of [appellant's] neck, out her shoulder and then down her arm." Dr. Saul testified that appellant's arm pain went away when he removed the osteophyte.
Thomas A. Bender, M.D., an orthopedic surgeon, testified on behalf of appellee.[4] Dr. Bender testified he evaluated appellant on April 2, 1996. His evaluation included getting an extensive history from appellant, reviewing her medical records, including the CAT scan report, the x-rays and the MRI, physically examining appellant, and taking x-rays of appellant's neck in April 1996. Dr. Bender testified that the CAT scan showed evidence of degenerative changes and spur formation and that the MRI showed bone spur formation. Dr. Bender opined that the MRI was "consistent with some degenerative changes at the C5-6 disc space." Dr. Bender testified that the bone spur was compatible with appellant's complaints of neck and arm pain.
Dr. Bender testified it was his opinion that the bony spur found in appellant's cervical vertebra was not caused by the accident but rather was a pre-existing condition. Dr. Bender explained that "[a] bone spur like that is not going to form that soon after trauma. Typically, bone spur formation of that degree of description may be present several years before the time of the * * * accident, or consistent with this history we know of some degeneration present throughout her spine." Dr. Bender stated that some people can have osteophyte without having symptoms until they experience a trauma such as a car accident. Dr. Bender stated that while symptoms with a degenerative process usually increase with time, appellant's symptoms came and went.
Dr. Bender testified it was also his opinion that the surgery was indicated for a degenerative process rather than for an acute post-traumatic process, and that the surgery was not related to the accident. Dr. Bender explained that if appellant's symptoms had been traumatically induced to the degree surgery is needed, he would have "expected surgical intervention within two to three months of the accident, not 11 months later." Dr. Bender testified that he would be more comfortable with a direct causation between the accident and appellant's symptoms if appellant had experienced arm pain immediately after the accident and if the pain had stayed there and persisted. Dr. Bender stated that was, however, not true in appellant's case.
With regard to Jack Krauss' loss of consortium claim, the jury returned a verdict in the amount of $0. As already noted, appellant testified that following the accident, she had a "hard time" doing household chores and that as a result, she depended heavily on her husband and children to help out. At the time of the accident, appellants' children were fifteen, thirteen, and seven years old. Jack Krauss testified that following the accident, it was difficult for his wife to complete a lot of the household duties. Krauss stated someone would always go with his wife grocery shopping to carry the groceries for her.
Jack Krauss also testified that the accident somewhat curtailed the family's social activities in that appellant did not feel like doing a lot of things and usually preferred to stay home and rest. As an example, Jack Krauss stated that while appellant would still go to King's Island with her family, she would no longer go on the roller coaster rides. Jack Krauss also testified that after the accident, his wife would sleep more, would not be as active with him or the children, and "seemed to be tired, maybe even somewhat tired." Jack Krauss testified that during appellant's six week post surgery recovery period, he and their two older children pitched in quite a bit with the household duties to give appellant the opportunity to rest and recuperate. Jack Krauss testified that while the family's lifestyle is better now than it was after the accident, his wife does not participate in a lot of the family activities to the extent that she did prior to the accident.
It is well-established that when there is a conflict in the testimony on any subject, the question is one for the trier of fact. Barnett v. Hills (App. 1947), 50 Ohio Law Abs. 208, 212. As the trier of fact in this case, the jury was "free to accept or reject any or all of appellant's evidence relating to * * * damages." Peck v. Ryan (June 30, 1988), Butler App. No. CA87-09-120, unreported, at 4. Moreover, even assuming that appellant presented undisputed evidence, the jury possessed the inherent power to reject the evidence presented. Lanham v. Wilson (Aug. 12, 1991), Madison App. No. CA90-11-024, unreported. A jury is free to reject any evidence and is not required to accept evidence simply because it is uncontroverted, unimpeached or unchallenged. Ace Steel Baling, Inc. v. Portefield (1969),19 Ohio St.2d 137, 138.
In addition, the jury's verdict was not tested by interrogatories. While appellants could have requested such interrogatories pursuant to Civ.R. 49(B), they did not do so. In Clay v. Baltimore Ohio Railroad Co. (Dec. 8, 1986), Warren App. No. CA85-09-057, unreported, at 5, this court alluded to the "complications associated with testing a jury verdict within the context of a motion for a new trial when the verdict has not been tested by interrogatories." Such an omission fails to inform a reviewing court of that evidence which the jury ultimately accepted or rejected in reaching its verdict.
Having reviewed the record and in light of the foregoing, we decline, as did the trial court, to substitute our judgment for that of the jury. Absent interrogatories, we cannot say that the jury verdict was against the manifest weight of the evidence. Moreover, we find that some competent and credible evidence supports the jury's verdict. Therefore, the trial court did not abuse its discretion in denying appellants' motion for a new trial. Both of appellants' assignments of error are overruled and the judgment of the trial court is affirmed.
POWELL, P.J., and WALSH, J., concur.
[1] When referred to together, Mr. and Mrs. Krauss will be referred to as appellants. However, when referred to separately, Mrs. Krauss will be referred to as appellant and Mr. Krauss as Jack Krauss.
[2] Stedman's Medical Dictionary, Fifth Unabridged Lawyer's Edition (1982), defines "spondylosis" as "vertebral ankylosis; this term is also often applied nonspecifically to any lesion of the spine of a degenerative nature." Id. at 1322.
[3] An osteophyte is a bony outgrowth.
[4] Like Drs. Drohan, Graf, and Saul, Dr. Bender testified at trial by way of videotape deposition.